Manfred E. BIELASS and Lois
Bielass, Plaintiffs,

v.

NEW ENGLAND SAFE SYSTEM, INC.
and the United States of
America, Defendants.

Civ. A. No. 84–0435–Y.

United States District Court,
D. Massachusetts.

Sept. 10, 1985.

Peter M. Malaguti, Boston, Mass., Bingham & Evangelista, Lynnfield, Mass., for plaintiffs.

Martha Sosman, Asst. U.S. Atty., Boston, Mass., for U.S.

John Mee, Johnson, Mee & May, Boston, Mass., for New England Safe System, Inc.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

The plaintiffs Manfred and Lois Bielass ("the Bielasses") brought this action against the defendants New England Safe System, Inc. ("Safe System") and the United States of America ("the United States") for damages allegedly resulting from the auction sale of the Bielasses' household goods. The Bielasses assert subject matter jurisdiction pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1346. The United States has moved for summary judgment in its favor on all counts asserted against it. For the reasons that follow, the motion is allowed in part and denied in part.

### I. *Factual Background*

The Bielasses have alleged the following facts: In late 1979, the Bielasses, American citizens who had been residing in West Germany for approximately 18 years, decided to move back to the United States. During their years in West Germany, they had accumulated a large amount of house-

*hold goods.* The Bielasses arranged to have most of these belongings shipped from West Germany to the United States, and on or about March 26, 1980, the goods arrived at the port in Boston. At that time, they made arrangements with Safe System to store their possessions until they became settled in the United States.

Safe System allegedly informed the Bielasses that they could leave their goods, for an indefinite period of time, in the possession of the United States Customs Service. Acting upon this advice from Safe System, the Bielasses permitted the goods to be removed from the ship and placed in the custody of the Customs Service in a general order warehouse. However, no one ever made "entry" of the goods—that is, no one ever filed the required documentation with the Customs Service to get the shipment released from Customs Service custody, as provided by 19 U.S.C. § 1484 and 19 C.F.R. § 141.4. Normally, entry of goods is to be made within five business days after the arrival of the goods. 19 C.F.R. § 141.5. Because no entry was made, the Bielasses' goods were placed in a general order warehouse under the custody of the Customs Service. *See* 19 U.S.C. § 1490(a) (when entry is not made in a timely manner, the customs officer "shall take the merchandise into his custody and send it to a bonded warehouse or public store, to be held at the risk and expense of the consignee until entry is made or completed and the proper documents are produced, or a bond given for their production"); 19 C.F.R. § 127.1.

On several occasions between March 1980 and June 1981, Safe System representatives corresponded with the Bielasses and informed them of the storage charges that had been incurred. According to the Bielasses, in June 1981 they were informed by Safe System that their goods could be auctioned off by the Customs Service after two years in general order storage, but that the possessions "were safe for up to two years." Complaint ¶¶ 14–15. In fact, the Customs Service considered the goods to be "unclaimed or abandoned" after they remained unentered for one full year after their arrival. 19 U.S.C. § 1491(a); 19

C.F.R. §§ 127.11, 127.21. Consequently, the goods were sold at public auction in June 1981. The Customs Service gave no prior notice of the auction to either the Bielasses or Safe System, and it was not until November 27, 1981 that the Bielasses learned that their possessions had been sold.

After filing a claim for damage with the Customs Service, the Bielasses brought this action against Safe System (for alleged negligence, conversion, and strict liability) and against the United States for alleged negligence, strict liability, and breach of a bailment contract.

## II. *The Tort Claims*

■ The United States may not be held liable for torts committed by its employees except where there has been a clear waiver of sovereign immunity. *Dalehite v. United States*, 346 U.S. 15, 31, 73 S.Ct. 956, 965, 97 L.Ed. 1427 (1953). The Federal Tort Claims Act ("the Act") provides that the United States shall be liable, to the same extent as a private party, "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). However, the Act's broad waiver of sovereign immunity is subject to 13 enumerated exceptions, including "[a]ny claim arising in respect of the assessment or collection of any tax or customs duty, or the detention of any goods or merchandise by an officer of customs or excise or any other law-enforcement officer." 28 U.S.C. § 2680(c).

The question presented by the pending motion is whether the exemption of § 2680(c) bars the Bielasses' tort claims against the United States. The Supreme Court recently addressed the scope of the § 2680(c) exemption in *Kosak v. United States*, 465 U.S. 848, 104 S.Ct. 1519, 79 L.Ed.2d 860 (1984). In that case, the Customs Service seized the plaintiff's art collection on the suspicion that the collection had been illegally smuggled into the coun-

try. After the plaintiff was acquitted of a smuggling charge, the Customs Service notified him that the art objects were subject to civil forfeiture. The plaintiff responded by filing a petition for relief from the forfeiture, which was granted, and the objects were returned to him. The plaintiff then sued the government, alleging that the property had been damaged while in the possession of the Customs Service.

The Supreme Court held that the plaintiff's suit was barred by the exemption of § 2680(c). It rejected the plaintiff's argument that the exemption was intended only to cover claims for damages attributable to an illegal detention or for damages "caused by the detention itself." *Id.* 104 S.Ct. at 1523. Instead, the Court construed the language of § 2680(c) broadly and held that the exemption applied to "any claim 'arising out of' the detention of goods, and includes a claim resulting from negligent handling or storage of detained property." *Id.* at 1524.

The Bielasses argue that the reach of *Kosak* should be limited to its particular facts, and that the decision is not controlling here. They accurately point out that the Supreme Court expressly declined to construe the meaning of the word "detention", as used in § 2680(c), since the plaintiff in that case had conceded that his goods were "lawfully detained" by customs officers. *Id.* at 1523 n. 8. The Bielasses do not made such a concession here—rather, they contend that there was no "detention" of their goods at all. They argue that, because they voluntarily chose to have the goods stored by the Customs Service and could have claimed the goods by making "entry" and fulfilling other procedural requirements, the § 2680(c) exemption simply does not apply.

This Court is not persuaded by that argument, particularly given the Supreme Court's broad interpretation of § 2680(c) in *Kosak.* An identical argument was recently rejected by the court in *Audio Systems, Inc. v. United States,* No. C83–81V (W.D. Wash. May 24, 1984), which held that the word "detention" embraces the possession of imported goods which are stored in a general order warehouse pending proper entry and payment of import duties. Under the circumstances of this case, where the Bielasses' goods were held by the Customs Service for failure to make entry, this Court holds that the goods were "detained" within the meaning of § 2680(c). Moreover, the Bielasses' claims that the Customs Service improperly disposed of those goods constitute claims "arising out of" the detention. *See Kosak, supra,* 104 S.Ct. at 1524.

█ For these reasons, the Bielasses' tort claims against the United States are exempt from coverage of the Federal Tort Claims Act and are consequently dismissed.

III. *The Breach of Contract Claim*

In addition to their tort claims, the Bielasses have alleged that the Customs Service breached "a contract of bailment by which the Customs Service undertook to store, control and take care of the goods." Complaint ¶¶ 37–38. The Bielasses have not alleged that there was any express contract or agreement between them and the Customs Service. Although they have not addressed this issue in their papers opposing the present motion, the Bielasses apparently contend that a bailment contract can be implied from the circumstances. An implied contract is "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the circumstances, their tacit understanding." *Baltimore and Ohio R.R. v. United States,* 261 U.S. 592, 597, 43 S.Ct. 425, 426, 67 L.Ed. 816 (1923).

There is nothing in the record to indicate that the Bielasses themselves had any direct contact with the Customs Service prior to the auction sale in June 1981. However, the Bielasses have alleged that Safe System, acting on their behalf, "arranged" with the Customs Service to have their goods removed from the ship and placed in a general order warehouse. Complaint ¶ 12. This allegation is not supported by

affidavit and is contradicted by a sworn statement from Stephan Busse, the president of Safe System, indicating that the Customs Service, in cooperation with the port authority, arranged the transfer of the Bielasses' goods "without any arrangement on the part of [Safe System]." Answers by Stephan Busse to Plaintiff's First Set of Interrogatories, No. 25 (Oct. 31, 1984) (hereinafter referred to as "Busse Answers"). The United States has also argued that the Customs Service had no agreement or understanding with the Bielasses, but simply took custody of goods "that had been unloaded and left at the port without being entered."

The Bielasses have also alleged that Safe System filed with the Customs Service several documents listing the names and addresses of the Bielasses, Safe System, and the shipper who transported the goods across the Atlantic Ocean. Attached to the complaint are two Customs Service forms—a "Carriers Certificate" and a "Cargo Declaration"—which include those names and addresses and which allegedly were filed with the Customs Service. Complaint ¶ 12, Exhibits B & C. This allegation is also contradicted by Busse, who has stated that the "Carriers Certificate and Delivery Order [were] both prepared but not filed with U.S. Customs (as not customary)." Busse Answers, No. 23(a). The United States has not addressed the issue of the Customs Service forms—an affidavit executed by John Linde, the District Director of the Customs Service, states that no "entry" documents were filed with the Customs Service, but does not indicate whether any other kinds of documents were filed. Linde Affidavit ¶ 9.

In summary, there appears to have been little or no direct contact between Safe System and the Customs Service relating to the actual transfer of the Bielasses' goods from the port to the general order warehouse. On the other hand, Busse has stated that a Safe System representative contacted the Customs Service at least three times between March 1980 and the June 1981 auction. Busse Answers, No. 19. These contacts are described as inquiries regarding "storage charges on behalf of the plaintiff." *Id.* It also appears that Safe System may have relied on the Customs Service to give it notice prior to any scheduled auction of the Bielasses' property—Busse described a June 22, 1981 telephone conversation between him and Mr. Bielass in which "Bielass was advised about correction from two to one year storage as per our letters dated June 18, and 19, 1981, and that we will advise him immediately about any notification regarding a possible auction should we receive such notification from Customs." Busse Answers, No. 14.

If Safe System did in fact expect prior notification from the Customs Service before any auction took place, such reliance would seem to have been reasonable in light of federal regulations which require the Custom Service to give 30 days notice to the owners of unclaimed merchandise, or their appropriate representatives, before the merchandise is sold at public auction. 19 C.F.R. § 127.24. The Bielasses have alleged that the crates containing their belongings were marked with their name and address. Complaint ¶ 7. If so, it would appear that the Customs Service, had it followed its own regulations, could have provided prior notice without much difficulty. Neither the United States' brief nor the Linde affidavit refer to the Customs Service regulations pertaining to notice.

■ On this motion for summary judgment, the Court must review the record in the light most favorable to the Bielasses and "indulge all inferences" favorable to them. *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). The Bielasses would have a stronger argument if they had specifically addressed the breach of contract issue in their opposing papers and had filed supporting affidavits. "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading...." Fed.R.Civ.P. 56(e); *see Hahn,*

*supra,* 523 F.2d at 466. Nonetheless, this Court concludes that summary judgment on this claim would be inappropriate at this stage of the proceedings. On the existing record, a reasonable jury could infer that either the Bielasses, or Safe System acting on behalf of the Bielasses, had reached at least a tacit understanding with the Customs Service that the Bielasses' belongings would be placed in a general order warehouse and would not be sold at auction without prior notice. Had the Customs Service complied with its own regulations regarding notice, the goods may very well have been reclaimed by the Bielasses prior to the scheduled date of the auction. Under these circumstances, the Court rules that there is a genuine issue of fact regarding the existence of an implied contract of bailment.

For the foregoing reasons, the United States' motion for summary judgment is ALLOWED with respect to the Bielasses' tort claims, but DENIED with respect to the breach of contract claim.